United States Court of Appeals,

Fifth Circuit.

No. 92-1056.

PERSONAL PREFERENCE VIDEO, INC., et al., Plaintiffs-Appellees,

v.

HOME BOX OFFICE, INC., Defendant-Appellant.

March 17, 1993.

Appeals from the United States District Court for the Northern District of Texas.

Before REAVLEY, KING and WIENER, Circuit Judges.

REAVLEY, Circuit Judge:

Personal Preference Video obtained judgment against Home Box Office, Inc. (HBO) for tortious interference with a contract. On appeal, HBO asserts that its actions were justified as a matter of Texas law. We reverse and render judgment in favor of HBO.

## I. BACKGROUND

This lawsuit concerns the telecast rights to the September 21, 1985, championship boxing fight between Larry Holmes and Michael Spinks ("the fight"). Don King and Butch Lewis, doing business as Dynamic Duo, promoted the fight. In June 1985, HBO and Dynamic Duo entered into an agreement whereby HBO acquired rights to telecast the fight (Dynamic Duo-HBO contract). Paragraph 2 of the contract provides: "Except as set forth in paragraph 3, below, HBO shall have the exclusive and irrevocable right to exhibit the [fight] in any and all media on the HBO programming services throughout the United States, its territories, commonwealths and possessions (the "Territory")...." Paragraph 3 states: "Notwithstanding paragraph 2, above, [Dynamic Duo] may authorize ... [l]ive exhibition of [the fight] in the Territory by means of closed-circuit television...." HBO asserts that the Dynamic Duo-HBO contract gave HBO the exclusive right to telecast the fight live to home viewers. According to HBO, the "closed-circuit" right retained by Dynamic Duo includes only the right to telecast the fight to paying audiences in public places such as theaters, arenas, and bars.

Sometime after the parties executed the Dynamic Duo-HBO contract, Dynamic Duo hired J & J Sports Productions (J & J) to market the "closed-circuit" telecast of the fight. In August 1985, J & J and Personal Preference Video (PPV) entered into a contract purporting to grant PPV the right to broadcast the fight on a pay-per-view basis to homes equipped with satellite dishes (J & J-PPV contract). At that time, PPV was a start-up company established by Virgil C. Dawson to provide movies and special events to homes equipped with satellite dishes. PPV's programming services were to be offered on a pay-per-view basis using decoders which would unscramble the signal for paying customers. Dawson testified that he planned to launch his company by telecasting the Holmes-Spinks fight.

In August 1985, HBO learned of PPV's plans to telecast the fight to homes with satellite dishes. HBO contacted Dynamic Duo's attorneys and warned them that PPV's telecast would run afoul of the Dynamic Duo-HBO contract which, HBO insisted, granted HBO the exclusive right to telecast the fight to home viewers. HBO then sent a letter to Dawson notifying him that PPV's proposed telecast would infringe on HBO's exclusive right to exhibit the fight. Sometime on or before September 9, 1985, HBO's attorney and Dynamic Duo's attorney telephoned the vice president of J & J. According to J & J's vice president, HBO's attorney told him that the J & J-PPV contract "had to be terminated." On September 9, 1985, HBO sent a letter to Dynamic Duo's attorneys warning them again that the PPV telecast would constitute a material breach of the Dynamic Duo-HBO contract and that HBO would pursue legal remedies if the matter was not resolved. On that same day, J & J sent a telegram to PPV explaining that J & J did not have the authority to convey home satellite rights to PPV and that PPV should stop marketing the home satellite telecast. After receiving the telegram from J & J, PPV agreed to stop marketing the telecast. Thereafter, PPV filed this lawsuit in a federal district court claiming under Texas law that HBO tortiously interfered with the J & J-PPV contract.

The jury returned a verdict in favor of PPV, awarding $350,000 in actual damages and $200,000 in punitive damages. On appeal, HBO contends, *inter alia,* that HBO's actions were justified as a matter of Texas law.

## II. DISCUSSION

Under Texas law, a plaintiff claiming tortious interference with a contract must prove that (1) a contract subject to interference existed, (2) the defendant's act of interference was willful and intentional, (3) the defendant's intentional act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). However, the defendant's interference is legally justified or excused if (1) the interference was done in a bona fide exercise of the defendant's own rights or (2) the defendant had an equal or superior right in the subject matter to that of the plaintiff. *Id.* This privilege extends to good faith assertions of colorable legal rights. *See id.; International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1271 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). The privilege of legal justification is an affirmative defense to a tortious-interference claim. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

HBO does not deny that it interfered with the J & J-PPV contract, but HBO asserts that its interference was legally justified because it was done in a bona fide exercise of HBO's exclusive right to telecast the fight to home viewers. The district court submitted the issue of legal justification to the jury, which found that HBO's interference was not justified. The question of justification is generally considered a factual issue to be decided by the jury. *See id.* at 690-91; *DBI Serv., Inc. v. Amerada Hess Corp.,* 907 F.2d 506, 508-09 (5th Cir.1990). On appeal, HBO contends that its interference was justified as a matter of law.

To determine whether HBO was acting to protect its own legal right or a colorable legal right, we must first consider what rights HBO obtained under the Dynamic Duo-HBO contract. As provided in the contract, New York law governs our construction of the Dynamic Duo-HBO contract. Although the issue of justification is often characterized as a question of fact under Texas law, the interpretation of an unambiguous contract is a question of law. Under New York law, a contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business." *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (applying New York law) (citations omitted); *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990). In our construction of the Dynamic Duo-HBO contract, we need only consider the parties' objective intent as evidenced by the language of the contract and the industry terminology.

A. INTERPRETING THE DYNAMIC DUO-HBO CONTRACT

In paragraph 3 of the Dynamic Duo-HBO contract, Dynamic Duo reserved the right to authorize live exhibition of the fight "by means of closed-circuit television." The parties' primary dispute, at trial and on appeal, concerns the definition of "closed circuit" as that term is used in the Dynamic Duo-HBO contract.

*1. PPV's Interpretation*

PPV asserts that the phrase "by means of closed-circuit television" refers to a particular means of transmitting a television or radio signal to specific viewers. That is, the term closed circuit merely describes a technology, whereby the telecast goes to a finite number of locations, rather than to the public at large.[1] Based on this definition of closed circuit, PPV's proposed telecast to homes equipped with satellite dishes and the necessary decoder would have been "by means of closed-circuit television." PPV claims that the right it acquired from J & J—to telecast the fight on a pay-per-view basis to homes equipped with satellite dishes—falls within the closed-circuit right retained by Dynamic Duo in paragraph 3 of the Dynamic Duo-HBO contract. Thus, PPV contends that HBO had no right to object to PPV's proposed telecast because the telecast would not have infringed HBO's contractual rights.

To support its definition of closed circuit at trial, PPV presented the testimony of Dawson, PPV's owner and an active participant in the satellite industry, and Albert P. Kelly, whom PPV identifies as an expert in satellite communications technology. Both witnesses testified that closed circuit is merely a means of distributing a television signal to authorized points of reception. Kelly's

---

[1]Under this definition, telecast to the general public by ABC, CBS, NBC, and FOX are not closed-circuit telecasts, but telecast by cable programmers such as ESPN, HBO, and Showtime are closed-circuit telecasts. A cable television system utilizes closed-circuit technology.

background is in selling, installing, and maintaining satellite systems. He has helped conduct telecasts of boxing matches (and similar events), but has not been involved in negotiating telecast contracts with boxing promoters. Kelly testified that closed circuit has no special meaning in the boxing business. At trial, PPV also introduced several dictionaries and encyclopedias that also broadly defined closed circuit in the technological sense. *See, e.g.,* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 250 (1985) ("a television installation in which the signal is transmitted by wire to a limited number of receivers"); MCGRAW-HILL ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 45 (6th ed. 1987) ("A video communication system in which the signal is transmitted from the point of origin only to those specific receivers that have access to it by previous arrangement."); LONGMAN DICTIONARY OF MASS MEDIA AND COMMUNICATION 53 (Tracy Daniel Connors ed. 1982) ("transmission of television signals over a communications line or system (rather than broadcasting them) for reception by only certain receivers; often used for major sports events, industrial, and educational applications").

*2. HBO's Interpretation*

HBO asserts that the "closed-circuit" right retained by Dynamic Duo only encompasses the right to telecast the fight to paying audiences in commercial establishments, such as theaters, arenas, and bars. Under the Dynamic Duo-HBO contract, HBO claims the exclusive right to telecast the fight to home viewers. Thus, HBO contends that it justifiably interfered with PPV's proposed telecast.

In support of HBO's position, two HBO representatives who negotiated the Dynamic Duo-HBO contract testified that the term closed circuit, as used in the boxing industry, refers to exhibitions in public locations where people pay an admission fee. The two HBO representatives indicated that they have negotiated several similar telecast contracts with boxing promoters. One of Dynamic Duo's attorneys involved in negotiating the Dynamic Duo-HBO contract agreed with HBO's definition and HBO's position that the Dynamic Duo-HBO contract granted HBO the exclusive right to telecast to home viewers. The Dynamic Duo attorney testified that throughout his career he has represented boxers, boxing promoters, and closed-circuit exhibitors. Additionally, HBO introduced

the testimony of two closed-circuit exhibitors, Louis A. Falcigno, owner and president of Momentum Enterprises, and Joseph Hand, Jr., president of Joe Hand Promotions. Both Falcigno and Hand testified that they have obtained closed-circuit rights to every major boxing event since the 1970s, and that they have done business with both Don King and Butch Lewis. Both Falcigno and Hand testified that, in the boxing industry, closed-circuit rights do not include the right to telecast to homes. Furthermore, the vice president of J & J, the company that contracted with PPV, conceded that, in boxing telecast contracts, closed circuit refers to "a telecast via satellite or telephone lines into an arena or into a bar, something with substantial seating capacity."

In further support of its definition, HBO introduced several newspaper articles that used the term closed circuit to refer to telecasts of boxing events in public locations. *See, e.g.,* Larry Stewart, *Fight on Pay-Per-View TV Only, or at a Closed-Circuit Location,* L.A. TIMES, Dec. 7, 1989, at C12; Norman Chad, *Pay-Per-View Can Drive Closed-Circuit off Screen,* WASH. POST, July 2, 1988, at D2; Noel Gunther, *Closed-Circuit Heavyweight: Louis Falcigno, Beaming Bouts to America's Fight Fans,* N.Y. TIMES, June 19, 1988, at § 3, at 4.[2] Moreover, at least one of the encyclopedias on which PPV relies contains a definition consistent with HBO's position. *See* MCGRAW-HILL ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 46 (Closed-circuit television can describe situations where "the original television signal is transmitted and distributed to theaters which are equipped with large-screen television projection systems for displaying the received image to the paying audience.").

*3. Our Interpretation*

In construing a specific contractual term, we must give consideration to the meaning attributed to that term in the industry. *See Seiden,* 959 F.2d at 428 (noting that a contract is ambiguous if it is "capable of more than one meaning when viewed *objectively* by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and *terminology* as generally understood in the *particular*

---

[2] These articles distinguish between pay-per-view television and closed-circuit television, the latter being a telecast to commercial establishments, not to homes. This distinction is inconsistent with PPV's position. Under PPV's definition of closed-circuit, pay-per-view television is a type of closed-circuit telecast because the signals are transmitted to specific users.

*trade or business*") (emphasis added). We must also consider the contract in its entirety in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Goodheart Clothing Co. v. Laura Goodman Enter., Inc.,* 962 F.2d 268, 272-73 (2d Cir.1992) (applying New York law).

The jury should have played no role in interpreting the Dynamic Duo-HBO contract. Based on the parties' *objective* intent as evidenced by the contract language as a whole and the industry meaning of the term closed circuit, we conclude that this contract is susceptible to only one reasonable interpretation. To the extent that the industry meaning of the term closed circuit might be considered a question of fact under New York law, we note that the *overwhelming* evidence demonstrates as a matter of law that, in the boxing industry, closed circuit refers to a type of venue, not the method of transmitting the television signal.

Our examination of the Dynamic Duo-HBO contract as a whole accords with HBO's position that it had the exclusive right to telecast the fight to home viewers. The term closed circuit as used in paragraph 3 of the contract must be construed with reference to other provisions in the contract, particularly paragraph 2 of the contract. The first sentence of paragraph 2 states that "HBO shall have the *exclusive* ... right to exhibit the Event *in any and all media* on the HBO programming services throughout the United States...." (emphasis added). The word "exclusive" is used again in the fourth sentence of paragraph 2: "In addition to HBO's *exclusive* right to exhibit the Event live, HBO shall have the right to exhibit the Event on a delayed basis...." Paragraph 3 limits HBO's "exclusive" right by providing that Dynamic Duo may authorize live exhibition by means of closed-circuit television.

PPV asserts that paragraph 2 only grants HBO the right to exhibit the fight "on HBO programming services," and that Dynamic Duo, in paragraph 3, retained the right to permit anyone to telecast the fight anywhere, so long as the telecast utilized closed-circuit *technology.* Under PPV's interpretation, Dynamic Duo retained the right to permit other cable programming companies, such as Showtime or ESPN, to telecast the fight to home viewers.[3] PPV's interpretation would render the

---

[3]Cable programmers utilize close-circuit technology.

language "exclusive" and "in any and all media" meaningless. Moreover, it ignores that HBO's own telecast of the fight utilized closed-circuit technology.

Given the contract language as a whole and the prevailing industry meaning of the term closed circuit, we interpret the Dynamic Duo-HBO contract as conveying to HBO the exclusive right to telecast the fight live to home viewers.[4] Under paragraph 3, Dynamic Duo retained the right to telecast the fight to public venues.[5]

## B. LEGAL JUSTIFICATION

We hold that HBO's interferences was justified as a matter of law. If it be necessary under Texas law to prove good faith assertion, even of a valid superior right, HBO acted to protect its own contractual interest, and the record overwhelmingly demonstrates that HBO acted in good faith. *See Victoria Bank,* 811 S.W.2d at 939-40; *Rally's,* 939 F.2d at 1271.

The judgment of the district court is reversed and judgment is here rendered in favor of HBO.[6]

REVERSED and RENDERED.

---

[4]Even if we were to take into account the parties' subjective intent, the evidence overwhelmingly supports HBO's contention that the Dynamic Duo and HBO intended for HBO to have the exclusive right to telecast the fight to home viewers.

[5]We interpret the language "on HBO programming services" found in paragraph 2 to mean that HBO could exhibit the fight only on the HBO channel, which is generally marketed through cable companies to subscribers. Thus, HBO could not transfer its exclusive telecast rights to ABC, CBS, NBC, ESPN, Showtime, etc.

[6]This lawsuit was brought by PPV and Space Age Video of Texas, Inc. During trial, the district court dismissed Space Age Video's claims, and only submitted questions concerning PPV's tortious interference claim to the jury. However, the district court's final judgment purports to award damages to PPV *and* Space Age Video. The inclusion of Space Age Video in the court's final judgment was an oversight. We vacate any final judgment by the district court in favor of Space Age Video.